GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:     ANDREW C. ADAMS
          Assistant United States Attorney
          One Saint Andrew's Plaza
          New York, New York 10007
          Tel. (212) 637-2340

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

                                                    :

               -v.-                                 :        **<u>VERIFIED COMPLAINT</u>**
                                                    :        **<u>FOR FORFEITURE</u>**

$400,000  IN UNITED STATES CURRENCY,    :        18 Civ.

                              Defendant-<u>in</u>-<u>rem</u>.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff United States of America, by its attorney Geoffrey S. Berman, United

States Attorney for the Southern District of New York, for its verified complaint, alleges, upon

information and belief, as follows:

## I.   <u>JURISDICTION AND VENUE</u>

        1.     This action is brought pursuant to Title 18, United States Code, Section 981

by the United States of America seeking the forfeiture of $400,000 in United States currency (the

"Defendant Funds" or the "defendant-in-rem").

        2.     This Court has jurisdiction pursuant to Title 28, United States Code, Section

1355.

        3.     Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A)

because certain actions and omissions giving rise to forfeiture took place in the Southern District

of New York and pursuant to Title 28, United States Code, Section 1395 because the Defendant

Funds have been transferred to the Southern District of New York.

4.      The Defendant Funds constitute property involved in money laundering and proceeds of wire fraud, and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) and (a)(1)(C).

5.      Upon entry of a final order forfeiting the Defendant Funds to the United States, the Government intends to recommend that the Defendant Funds be distributed to victims of the payday lending scheme perpetrated by Scott Tucker ("Tucker"), consistent with the applicable Department of Justice regulations, through the ongoing remission process. *See* 18 U.S.C. § 981(e)(6) and 28 C.F.R. Part 9.

## II.    BACKGROUND

6.      From at least in or about 2012 through in or about 2017, Central States Capital Markets, LLC ("CSCM"), violated the Bank Secrecy Act ("BSA"), Title 31, United States Code, Sections 5318(g) and 5322(a), and its implementing regulations, through CSCM's willful failure to report suspicious transactions relevant to a possible violation of law or regulations as required by the Secretary of Treasury.   CSCM's violations included the failure to timely report suspicious banking activities of Tucker, a longtime customer.

7.      On October 13, 2017, Tucker and his attorney, Timothy Muir, were convicted in the United District Court for the Southern District of New York of, among other things, wire fraud and money laundering, in violation of Title 18, United States Code, Sections 1343 and 1956, for their roles in perpetrating a massive payday lending scheme.   From in or about the late 1990s through in or about 2013, through various companies that he owned and controlled (the "Tucker Payday Lenders"), Tucker extended short-term, high-interest, unsecured loans, commonly referred to as "payday loans," to individuals in New York and around the country at interest rates as high as 700 percent or more and in violation of the usury laws of numerous states,

2

including New York.  In order to induce customers to obtain the loans and to make payments on the loans exceeding the amounts allowed by law and the amounts which the customers were told they were required to pay, Tucker made material misrepresentations concerning the true cost of te payday loans offered by the Tucker Payday Lenders and the identity of the lender offering the loans. Tucker sought to inoculate himself against applicable laws by entering into a series of sham relationships with certain Native American tribes (the "Tribes") in which he assigned nominal ownership of his payday lending companies to certain corporations created under the laws of the Tribes in order to conceal his ownership and control of the Tucker Payday Lenders and gain the protection of tribal sovereign immunity—a legal doctrine that generally prevents states from enforcing their laws against Native American tribes.

8.      As described in greater detail in the attached Statement of Facts, Tucker used CSCM to launder millions of dollars of proceeds from his illegal payday lending scheme.

### III.    THE DEFENDANT-IN-REM

9.      On or about December 10, 2018, CSCM entered into a Deferred Prosecution Agreement (the "DPA") with the United States with respect to its violations of the BSA.  Under the DPA, CSCM agreed to forfeit $400,000 in United States currency to the United States.  Pursuant to the DPA, CSCM transferred the Defendant Funds to the United States in the Southern District of New York as a substitute *res* for funds processed by CSCM on behalf of Tucker in connection with his criminal conducts and as set forth in the Statement of Facts.  CSCM agrees that the Defendant Funds are subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C).

10.     The Deferred Prosecution Agreement and the accompanying Statement of Facts are attached as Exhibit 1 and are incorporated by reference herein.

3

## IV.  CLAIM FOR FORFEITURE

11.     Incorporated herein are the allegations contained in paragraphs one through ten of this Verified Complaint.

12.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

13.     "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7), and the term includes, among other things, any offense listed under Title 18, United States Code, Section 1961(1).  Section 1961(1) lists, among other things, violations of wire fraud (Section 1343).

14.     Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

15.     By reason of the foregoing, the Defendant Funds are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A) and (a)(1)(C), because the Defendant Funds constitute proceeds of wire fraud, in violation of Title 18, United States Code, Section 1343, and property involved in money laundering, in violation of Title 18, United States Code, Section 1956.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the defendant-in-rem and that all persons having an interest in the defendant-in-rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the defendant-in-rem to the United States of America for

disposition according to law, and that this Court grant plaintiff such further relief as this Court may

deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       December 19, 2018


                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the Plaintiff
                                        United States of America

                        By:            _____
                                        ANDREW C. ADAMS
                                        Assistant United States Attorney
                                        One St. Andrew's Plaza
                                        New York, New York 10007
                                        Telephone: (212) 637-2340

5

## **VERIFICATION**

STATE OF NEW YORK            )
COUNTY OF NEW YORK         :
SOUTHERN DISTRICT OF NEW YORK   )

         JERRY WHITTEN, being duly sworn, deposes and says that he is a Special Agent

with the Internal Revenue Service – Criminal Investigations ("IRS-CI"), and as such has

responsibility for the within action; that he has read the foregoing complaint and knows the

contents thereof, and that the same is true to the best of his knowledge, information, and belief.

         The sources of deponent's information on the ground of his belief are official

records and files of the United States, information obtained directly by the deponent, and

information obtained by other law enforcement officials, during an investigation of alleged

violations of Title 18, United States Code.


                         JERRY WHITTEN
                         Special Agent
                         Internal Revenue Service –
                         Criminal Investigations


Sworn to before me this
/8th day of December 2018


NOTARY PUBLIC

NOTARY PUBLIC – State of Kansas
MERRY L. BAXTER
My Appt. Expires 2-2-2022

6

Ex. 1



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York New York 10007*

December 10, 2018

Douglas R. Jensen, Esq.
Park Jensen Bennett LLP
40 Wall Street
New York, NY  10005

Re: Central States Capital Markets – Deferred Prosecution Agreement

Dear Mr. Jensen:

Pursuant to the understandings specified below, the Office of the United States Attorney for the Southern District of New York (the "Office") and the defendant Central States Capital Markets, LLC ("CSCM"), under authority granted by its two managing directors in the form of a director's resolution (a copy of which is attached as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

## The Criminal Information

1.      CSCM consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging CSCM with willful failure to timely file a Suspicious Activity Report ("SAR"), in violation of Title 31, United States Code, Sections 5318 and 5322(a) and Title 31, Code of Federal Regulations, Section 1023.320.  A copy of the Information is attached as Exhibit B.  This Agreement shall take effect upon its execution by both parties.

## Acceptance of Responsibility

2.      CSCM stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate, and admits, accepts and acknowledges that it is responsible under United States law for the acts of its officers and employees as set forth in the Statement of Facts.  Should the Office pursue the prosecution that is deferred by this Agreement, CSCM stipulates to the admissibility of the Statement of Facts in any proceeding including any trial and sentencing proceeding.

## Payment and Forfeiture Obligation

3.      As a result of the conduct described in the Information and the Statement of Facts, CSCM agrees to pay $400,000 (the "Stipulated Forfeiture Amount") to the United States, pursuant to this Agreement.

Douglas R. Jensen, Esq.
December 10, 2018

4.      CSCM agrees that the Stipulated Forfeiture Amount represents a substitute *res* for funds processed by CSCM on behalf of Scott Tucker as a result of the conduct described in the Statement of Facts, and is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

5.      CSCM further agrees that this Agreement, the Information and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint") that will be filed against the Stipulated Forfeiture Amount.  By this agreement, CSCM expressly waives any challenge to that Civil Forfeiture Complaint and consents to the forfeiture of the Stipulated Forfeiture Amount to the United States.  CSCM agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Stipulated Forfeiture Amount and will not assist a third party in asserting any claim to the Stipulated Forfeiture Amount. CSCM also waives all rights to service or notice of the Civil Forfeiture Complaint.

6.      CSCM shall transfer the Stipulated Forfeiture Amount to the United States by no later than December 19, 2018 (or as otherwise directed by the Office following such date). Such payment shall be made by wire transfer to the United States Treasury, pursuant to wire instructions provided by the Office.  If CSCM fails to timely make the payment required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to paragraphs 13 and 144 below.  CSCM certifies that the funds used to pay the Stipulated Forfeiture Amount are not the subject of any lien, security agreement, or other encumbrance. Transferring encumbered funds or failing to pass clean title to these funds in any way will be considered a breach of this Agreement.

7.      CSCM agrees that the Stipulated Forfeiture Amount shall be treated as a penalty paid to the United States government for all purposes, including all tax purposes.  CSCM agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any portion of the $400,000 that CSCM has agreed to pay to the United States pursuant to this Agreement.

### Obligation to Cooperate

8.      CSCM agrees to cooperate fully with the Office, the Internal Revenue Service ("IRS"), the Securities and Exchange Commission ("SEC") and any other governmental agency designated by the Office regarding any matter relating to the conduct described in the Information or Statement of Facts, or any matter relating to the payday lending scheme perpetrated by Tucker and the companies he owned and controlled.

9.      It is understood that CSCM shall (a) truthfully and completely disclose all information with respect to the activities of CSCM and its officers, agents, affiliates and employees concerning all matters about which the Office inquires of it, which information can be used for any purpose; (b) cooperate fully with the Office, IRS, the SEC and any other law enforcement agency designated by the Office; (c) attend all meetings at which the Office requests its presence and use its best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees of CSCM at any meeting or interview or before the grand jury or at

2

Douglas R. Jensen, Esq.
December 10, 2018

trial or at any other court proceeding; (d) provide to the Office upon request any document, record, or other tangible evidence relating to matters about which the Office or any designated law enforcement agency inquires of it; (e) assemble, organize, and provide in a responsive and prompt fashion, and upon request, on an expedited schedule, all documents, records, information and other evidence in CSCM's possession, custody or control as may be requested by the Office, IRS, the SEC, or designated law enforcement agency; (f) volunteer and provide to the Office any information and documents that come to CSCM's attention that may be relevant to the Office's investigation of this matter, any issue related to the Statement of Facts, and any issue that would fall within the scope of the duties of the independent consultant (the "Consultant") referred to in paragraph 19; (g) provide testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office, IRS, the SEC or designated governmental agency, including but not limited to information and testimony concerning the conduct set forth in the Information and Statement of Facts; (h) bring to the Office's attention all criminal conduct by CSCM or any of its agents or employees acting within the scope of their employment related to violations of the federal laws of the United States, as to which CSCM's Board of Directors, senior management, or United States legal and compliance personnel are aware; (i) bring to the Office's attention any administrative, regulatory, civil or criminal proceeding or investigation of CSCM or any agents or employees acting within the scope of their employment; and (j) commit no crimes whatsoever under the federal laws of the United States subsequent to the execution of this Agreement.

10.     CSCM agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for two years from the date of the Court's acceptance of this Agreement, unless otherwise extended pursuant to paragraph 15 below. CSCM's obligation to cooperate is not intended to apply in the event that a prosecution against CSCM by this Office is pursued and not deferred.

## Deferral of Prosecution

11.     In consideration of CSCM's entry into this Agreement and its commitment to: (a) accept and acknowledge responsibility for its conduct, as described in the Statement of Facts and the Information; (b) cooperate with the Office, IRS, the SEC, and any other law enforcement agency designated by this Office; (c) make the payments specified in this Agreement; (d) comply with Federal criminal laws (as provided herein in paragraph 9); and (e) otherwise comply with all of the terms of this Agreement, the Office shall recommend to the Court that prosecution of CSCM on the Information be deferred for two years from the date of the signing of this Agreement. CSCM shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

12.     It is understood that this Office cannot, and does not, agree not to prosecute CSCM for criminal tax violations. However, if CSCM fully complies with the terms of this Agreement, no testimony given or other information provided by CSCM (or any other information directly or indirectly derived therefrom) will be used against CSCM in any criminal tax prosecution.

3

Douglas R. Jensen, Esq.
December 10, 2018

In addition, the Office agrees that, if CSCM is in compliance with all of its obligations under this Agreement, the Office will, within thirty (30) days after the expiration of the period of deferral (including any extensions thereof), seek dismissal with prejudice as to CSCM of the Information filed against CSCM pursuant to this Agreement. Except in the event of a violation by CSCM of any term of this Agreement or as otherwise provided in paragraph 13, the Office will bring no additional charges against CSCM, except for criminal tax violations, relating to its conduct as described in the admitted Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than CSCM. CSCM and the Office understand that the Agreement to defer prosecution of CSCM can only operate as intended if the Court grants a waiver of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(2). Should the Court decline to do so, both the Office and CSCM are released from any obligation imposed upon them by this Agreement, and this Agreement shall be null and void, except for the tolling provision set forth in paragraph 13.

13.     It is further understood that should the Office in its sole discretion determine that CSCM has: (a) knowingly given false, incomplete or misleading information either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information and Statement of Facts, (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement, or (c) otherwise violated any provision of this Agreement, CSCM shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, of which the Office has knowledge, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice. Any such prosecution or civil action may be premised on any information provided by or on behalf of CSCM to the Office, IRS, or the SEC at any time. In any such prosecution or civil action, it is understood that: (a) no charge or claim would be time-barred provided that such prosecution or civil action is brought within the applicable statute of limitations period, excluding the period from the execution of this Agreement until its termination; (b) CSCM agrees to toll, and exclude from any calculation of time, the running of the applicable statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to paragraph 15 below; and (c) CSCM waives any objection to venue with respect to any charges arising out of the conduct described in the Statement of Facts and consents to the filing of such charges in the Southern District of New York. By this Agreement, CSCM expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of CSCM's counsel.

14.     It is further agreed that in the event that the Office, in its sole discretion, determines that CSCM has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made or acknowledged by or on behalf of CSCM to the Office, IRS or SEC, including but not limited to the Statement of Facts, or any testimony given by CSCM or by any agent of CSCM before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against

4

Douglas R. Jensen, Esq.
December 10, 2018

CSCM; and (b) CSCM shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made or acknowledged by or on behalf of CSCM before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

15.     CSCM agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 11 above (or any extensions thereof) that CSCM has violated any provision of this Agreement, an extension of the period of deferral of prosecution may be imposed in the sole discretion of the Office, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed three (3) years. Any extension of the deferral-of-prosecution period extends all terms of this Agreement for an equivalent period.

16.     CSCM, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement. Consistent with this provision, CSCM may raise defenses and/or assert affirmative claims and defenses in any proceedings brought by private and/or public parties as long as doing so does not contradict the Statement of Facts or such representations. Any such contradictory statement by CSCM, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and CSCM thereafter shall be subject to prosecution as specified in paragraphs 133 through 144, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 15, above. The decision as to whether any such contradictory statement will be imputed to CSCM for the purpose of determining whether CSCM has violated this Agreement shall be within the sole discretion of the Office. Upon the Office's notifying CSCM of any such contradictory statement, CSCM may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within two business days after having been provided notice by the Office. CSCM consents to the public release by the Office, in its sole discretion, of any such repudiation. Nothing in this Agreement is meant to affect the obligation of CSCM or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

17.     CSCM agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 13 and 14 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 1515, provided, however, that if CSCM's violation of this Agreement is limited to an untimely payment of the Stipulated Forfeiture Amount, the Office may elect instead to choose the additional financial penalties set forth in paragraph 6, above. CSCM understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court. Should the Office determine that CSCM has violated this Agreement, the Office shall provide notice to CSCM of that determination and provide CSCM with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or

Douglas R. Jensen, Esq.
December 10, 2018

in an extension of the period of deferral of prosecution, including because the violation has been cured by CSCM.

### CSCM's BSA/AML Compliance Program

18.     CSCM shall implement and maintain an effective Bank Secrecy Act ("BSA")/anti-money-laundering compliance program in accordance with the BSA, its implementing regulations, and the directives and orders of any United States regulator of CSCM, including without limitation the SEC.  It is understood that a violation of the BSA arising from conduct exclusively occurring prior to the date of execution of this Agreement will not constitute a breach of CSCM's obligations pursuant to this Agreement.  However, there shall be no limitation on the ability of the Office to investigate or prosecute such violations and/or conduct in accordance with the applicable law and the other terms of this Agreement, including paragraph 12 hereof.

### Independent Consultant

19.     To address issues related to the Statement of Facts and Information, and to ensure that CSCM complies with the BSA and its implementing regulations, CSCM agrees to retain an independent consultant on the terms and conditions set by the SEC.

### Limits of this Agreement

20.     It is understood that this Agreement is binding on the Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by CSCM or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of CSCM, and CSCM's compliance with its obligations under this Agreement.

### Sale or Merger of CSCM

21.     Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, CSCM agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

### Public Filing

22.     CSCM and the Office agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

Douglas R. Jensen, Esq.
December 10, 2018

       23.    The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

<u>**Execution in Counterparts**</u>

       24.    This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.  Further, all facsimile and digital images of signatures shall be treated as originals for all purposes.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Douglas R. Jensen, Esq.
December 10, 2018

### Integration Clause

25.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between CSCM and the Office.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, CSCM's attorneys, and a duly authorized representative of CSCM.

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By: _____

Andrew C. Adams
Assistant United States Attorney

_____

LISA ZORNBERG
Chief, Criminal Division

Accepted and agreed to:

_____

J. Daniel Stepp
Central States Capital Markets, LLC

_____

Douglas R. Jensen, Esq.
Attorney for Central States Capital Markets, LLC

8

Ex. A



## RESOLUTION OF MANAGING DIRECTORS
## OF CENTRAL STATES CAPITAL MARKETS, LLC

IT IS HEREBY RESOLVED, by the below-named managing directors of Central States

Capital Markets, LLC (the "Company"), that the Company is authorized to enter into the

Deferred Prosecution Agreement dated December 10, 2018 with the United States Attorney's

Office for the Southern District of New York, to which this Resolution is attached as Exhibit A.

_____
J. Daniel Stepp

_____
Robert M. Young

Ex. B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA
                                    :        **INFORMATION**

        -v.-
                                    :        18 Cr.

CENTRAL STATES CAPITAL
MARKETS, LLC,                       :

             Defendant.             :
- - - - - - - - - - - - - - - - - - x

## COUNT ONE
**(Willful Failure to File a Suspicious Activity Report
In Violation of the Bank Secrecy Act)**

        The United States Attorney charges:

        1.   From at least in or about 2012 up to and including in

or about 2017, CENTRAL STATES CAPITAL MARKETS, LLC ("CSCM"), the

defendant, did willfully fail to report suspicious transactions

relevant to a possible violation of law or regulation as

required by the Secretary of the Treasury, to wit, CSCM

willfully failed to timely report suspicious banking activities

of Scott Tucker, who used CSCM to launder millions of dollars of

proceeds from an illegal payday lending scheme.

        (Title 31, United States Code, Sections 5318 and 5322;
    Title 31, Code of Federal Regulations, Section 1023.320.)

                          _GEOFFREY S. BERMAN /S_
                          GEOFFREY S. BERMAN
                          United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

### - v. -

### CENTRAL STATES CAPITAL MARKETS, LLC,

### Defendant.

### INFORMATION

18 Cr.

(31 U.S.C. §§ 5318 and 5322
31 C.F.R. § 1023.320)

GEOFFREY S. BERMAN
United States Attorney.

Ex. C

## Statement of Facts

This Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Southern District of New York ("USAO") and Central States Capital Markets, LLC ("CSCM"). The parties agree and stipulate that the following information is true and accurate:

### Overview

1.      CSCM is a broker-dealer and investment advisor based in Prairie Village, Kansas. During the relevant time period, CSCM was registered with the Securities and Exchange Commission ("SEC") as a broker-dealer, municipal advisor, and investment adviser. According to CSCM's financial statements, in 2016, the firm had approximately $3.8 million in revenues and net losses of approximately $600,000.

2.      As discussed below, CSCM willfully failed to file a Suspicious Activity Report ("SAR") concerning transactions involving Scott Tucker ("Tucker"), a client, despite knowing, suspecting, or having reason to suspect that Tucker was using CSCM to launder proceeds from an illegal payday lending scheme. In doing so, CSCM violated a provision of the Bank Secrecy Act, 31 U.S.C. § 5322(a).

### The Bank Secrecy Act's Requirements

3.      The Currency and Foreign Transactions Reporting Act (known as the "Bank Secrecy Act" or "BSA"), Pub. L. 91–508, Tit. II, 84 Stat. 1118, codified at 31 U.S.C. §§ 5311-5332, requires broker-dealers like CSCM to take steps to "guard against" being used for money laundering or other crimes.

4.      To that end, the BSA and its implementing regulations require, among other things, that broker-dealers "report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). In particular, a broker-dealer is required to file a SAR every time it "knows, suspects, or has reason to suspect that . . . [t]he transaction involves funds derived from illegal activities" or that the "transaction has no business or apparent lawful purpose[.]" 31 C.F.R. § 1023.320(a)(2).

### CSCM's Relationship with Scott Tucker

5.      On October 13, 2017, Tucker and his attorney, Timothy Muir, were convicted after trial in the United States District Court for the Southern District of New York of racketeering, wire fraud and money laundering for their roles in perpetrating a massive payday lending scheme. As the jury found, from in or about the late 1990s through in or about 2013, through various companies that he owned and controlled (the "Tucker Payday Lenders"), Tucker extended short-term, high-

interest, unsecured loans, commonly referred to as "payday loans," to individuals around the country at interest rates as high as 700% or more and in violation of the usury laws of numerous states, including New York. Tucker sought to inoculate himself against applicable usury laws by entering into a series of sham relationships with certain Native American tribes (the "Tribes") in order to conceal his ownership and control of the Tucker Payday Lenders and gain the protection of tribal sovereign immunity – a legal doctrine that generally prevents states from enforcing their laws against Native American tribes.   To effectuate his scheme, Tucker assigned nominal ownership of his payday lending companies to certain corporations created under the laws of the tribes (the "Tribal Companies").

6.      In April 2012, CSCM opened investment accounts for multiple Tribal Companies. The account funds were held at another firm that provided custodial and clearing services (the "Clearing Firm") to CSCM. In the account opening documents, Tucker's brother Blaine ("BTucker") was granted full trading authorization for each of the Tribal Companies' accounts, but the space on the forms for identifying BTucker's relationship with the Tribal Companies was left blank. Tucker was not given any authority or otherwise mentioned in the account opening forms.

7.      In August 2012, CSCM opened a personal account for Tucker and an account for BA Services, LLC, an entity he owned and controlled. In his account opening documents, Tucker identified himself as an employee of another tribal company involved in the payday lending business. In September 2012, CSCM opened a personal account for BTucker.

8.      In November 2012, the Miami Tribe of Oklahoma (the "Miami") withdrew BTucker's signature authority for the Tribal Companies associated with the Miami, and the Santee Sioux Tribe of Nebraska (the "Santee Sioux") added the requirement of a signature from a tribal official for transactions in the account of the Tribal Company associated with the Santee Sioux. In March 2013, the Miami reinstated BTucker's authorization.

<u>CSCM's Willful Failure to File a SAR in Violation of the BSA</u>

9.      At all relevant times, CSCM had written policies, procedures, and controls, and designated its Chief Executive Officer (the "CEO") as its Anti-Money Laundering ("AML") Compliance Officer. Therefore, under CSCM's written supervisory procedures, the CEO had "full responsibility for the continual development and enforcement of [CSCM's] AML program," including, among other things, "monitoring for compliance of all AML areas by all employees," "internal [SARs] investigations," "filing of SARS," "ensuring that any other background checks undertaken are accomplished and documented," and "ensuring that all documented and/or non-documented client identification is appropriately maintained in client files."

10.     CSCM's written supervisory procedures required that a customer's identity be verified when opening a new account.  For commercial entities, CSCM's policies required the collection of "information sufficient to determine the corporate or business entity's identity and the authority of its business representative to act on its behalf."

11.     Under CSCM's written supervisory procedures, CSCM was required to file a SAR for any account activity involving $5,000 or more when it knew, suspected, or had reason to suspect that the transaction (1) involved funds derived from illegal activity or was "derived from illegal activity as part of a plan to violate or evade federal law or regulation," (2) was designed to evade any requirements of the BSA regulations, (3) had no business or apparent lawful purpose or was not the sort in which the customer would normally be expected to engage in, or (4) involved the use of CSCM to facilitate criminal activity.

12.     To detect suspicious transactions, CSCM's written supervisory procedures provided that "[f]or any transactions involving a clearing firm, [CSCM] will monitor through the clearing firm's automated exception reports for unusual size, volume, pattern or type of transaction."  The Clearing Firm made available to CSCM reports and electronic alerts designed to detect suspicious transactions.  CSCM's policies also identified various red flags, including for example a "customer (or a person publicly associated with the customer) [that] has a questionable background or is the subject of news reports indicating possible criminal, civil or regulatory violations."

<u>Ineffective KYC Due Diligence</u>

13.     CSCM failed to follow its written customer identification procedures and did not act upon red flags prior to opening investment accounts for the Tribal Companies.  CSCM discussed opening these accounts exclusively with Tucker and BTucker (the "Tuckers").  Although CSCM received account opening documents signed by tribal officials granting BTucker authorization over the accounts, CSCM routinely dealt with and took direction from Tucker concerning the management of funds in the Tribal Companies' accounts based solely on Tucker's oral assertions that he was a "consultant" to the Tribes.  At no point did CSCM obtain written verification of Tucker's authority over the accounts.

14.     CSCM also disregarded red flags that were known prior to opening the accounts. In March 2012, Tucker explained to the CEO that he was involved in the payday lending business and that he had approached certain Native American tribes to operate the payday lending business in order to take advantage of the tribes' sovereign immunity. Tucker further explained that the payday lending business had generated large cash reserves and that he was approaching CSCM because the business's existing bank, a small bank based in Florida (the "Florida Bank"), had asked Tucker to move excess accumulations of cash because of certain regulatory requirements it was unable to meet.  Neither the CEO, nor anyone at CSCM, attempted to verify this explanation.

3

15.     Shortly thereafter, CSCM also became aware of additional red flags concerning the Tuckers and the Tribal Companies.  Specifically, CSCM learned that Tucker had been convicted of fraud in 1991 and, separately, found news reports from as early as 2011 alleging that the Tuckers were engaging in a "rent-a-tribe" scheme in which the Tribal Companies were used by the Tuckers to claim ownership and control over the payday lending businesses in order to exploit the Tribal Companies' ability to assert sovereign immunity as a defense to charges that the payday lending business violated state usury laws.  CSCM also became aware of an action brought by the Federal Trade Commission ("FTC") against the Tuckers and the Tribal Companies, among others, for engaging in unfair business practices, which included allegations that the Tribal Companies were not protected by sovereign immunity.  CSCM, including its CEO, did not act upon these red flags because Tucker assured CSCM that the FTC action would soon be resolved and all challenges brought by state regulators had been unsuccessful due to sovereign immunity.

<u>CSCM Failed to Report Suspicious Transactions In the Accounts</u>

16.     CSCM failed to monitor any transactions using Actimize, an AML tool that was made available to CSCM by the Clearing Firm.  Between December 2011 and December 2015, Actimize generated 103 alerts but CSCM never checked any of the alerts, made any attempt to customize Actimize's default parameters, or undertook a review to ensure that this tool was sufficient for its specific monitoring needs or was being appropriately utilized.  Further, although the Clearing Firm furnished CSCM with the ability to generate a report reflecting, among other things, the identities of third parties transferring funds via wire transactions to CSCM account holders, CSCM never generated such reports.

17.     Numerous suspicious transactions went undetected and unreported by CSCM.  For example, between December 21, 2012 and March 13, 2013, 18 wire transfers totaling $40,518,000 were sent from Florida Bank accounts in the names of Tribal Companies to Tucker's personal CSCM account.  The transfers were in even dollar amounts and on several occasions, two different Tribal Companies, associated with different tribes, transferred the same dollar amounts, on the same day, to Tucker's personal CSCM account.  CSCM never asked Tucker or the Tribal Companies about any of these transactions.

18.     On March 4, 2013, CSCM processed a $9 million wire from Tucker's personal CSCM account to another financial institution, which Tucker had informed CSCM was for the payment of his taxes.  According to reports of the asset movement processing system used by CSCM, CSCM employees were presented, during the course of processing the wire, with two AML rule violations triggered by the transaction.  CSCM processed the wire without investigating the violations or reporting the wire to the appropriate authorities.

19.     In addition, Actimize generated AML alerts for certain transactions that occurred on March 12 and 13, 2013, but because CSCM never accessed this software, the alerts were not checked.  CSCM did not file a SAR with respect to any of these transactions.

The Clearing Firm Closed the Tucker and Tribal Companies Accounts and
CSCM Worked To Find Another Firm to Maintain Custody of the Accounts

20.    In or about March 2013, the Florida Bank decided to terminate its ACH processing program, including its banking relationship with the Tucker Payday Lenders, and required Tucker to move the funds from their operating accounts to another institution.  In mid-March 2013, the Tuckers approached CSCM about opening additional, operating accounts for the Tribal Companies on its platform to replace the Florida Bank.  CSCM agreed to consider opening these accounts even though operating accounts were outside the scope of CSCM's normal business activity as a broker-dealer and investment advisor.  Anticipating that the Clearing Firm might raise concerns with the expected activity in these operating accounts, CSCM contacted the Clearing Firm to discuss the additional accounts.

21.    CSCM, including the CEO, discussed the Tuckers and the Tribal Companies with the Clearing Firm's AML officers during a conference call on March 27, 2013.  CSCM's description of the Tuckers, the Tribal Companies, and their payday lending business caused the Clearing Firm's AML officers to raise concerns and pose questions to CSCM about all of the accounts associated with the Tuckers and Tribal Companies, including the investment accounts already maintained on the Clearing Firm's platform.  According to the AML officers, CSCM was not fully forthcoming in answering their questions, which contributed to their concerns.  Following the discussion, CSCM's relationship partner responsible for these accounts (the "Partner") sent the Tuckers an email describing the call with the Clearing Firm in which the Partner said "[o]ur conversations regarding these accounts were very generic.  Other than disclosing that these were tribal accounts we did not get into the nature of their business.  Had they asked we would have been as brief as possible in our description."

22.    According to the Clearing Firm's AML officers, after the March 27 call, they notified the CEO that the Clearing Firm was "not comfortable" with the Tucker and Tribal Companies accounts – with the new operating accounts and the preexisting investment accounts – and asked that CSCM not send funds to the new accounts until it had time to consider the AML concerns the accounts raised.  Nevertheless, CSCM allowed approximately $82.1 million in new funds to be transferred into these new accounts.

23.    In an April 3, 2013 email to CSCM, one of the Clearing Firm AML officers shared findings of additional research he had done regarding Tucker and his businesses, and included links to online sources indicating that Tucker was engaged in a "rent-a-tribe" scheme with the Tribal Companies, and revealing that he had served time in prison for fraud, was the subject of a civil RICO suit, and had been sued by the FTC.  According to the AML officer, he also orally reported other facts that he found suspicious: (1) that a payday lending business controlling over $200 million in cash would use a local bank in Florida, especially because neither the Tuckers,

based in Kansas, nor the Tribal Companies, based in Oklahoma and Nebraska, had any apparent connection to Florida; and (2) that the place of business for one of the Tribal Companies, which had over $100 million in cash and securities in its accounts at the time, appeared to be a trailer.

24.     CSCM's email in response to the AML Officer's April 3 email did not address concerns over whether the Tuckers truly controlled the Tribal Companies' funds and focused instead on the fact that state courts had upheld the Tribal Companies' assertion of sovereign immunity. The CEO stated "[t]hrough our research we found, read, and digested the articles you included in your email—as well as countless others before accepting any account." Regarding the state suits, the CEO said "[w]e acknowledge that these people/organizations have been investigated/sued by various regulatory/legal entities . . . To the best of our knowledge, at this point all such efforts have been thwarted by the courts or resolved by legal agreements with the agency involved." Regarding the FTC suit, the CEO said "[t]he issue with the [FTC] was resolved through negotiation and an agreement was signed with them in January 2013." (Although that agreement set conditions for the Tucker Payday Lenders' ongoing operations, the merits of the case continued to be litigated and in September 2016 resulted in a $1.3 billion judgment against Tucker.) The CEO assured the Clearing Firm that, due to limitations placed on the accounts, no funds could be transferred directly to a third party. The CEO also remarked that, "[i]n summary, we feel that while this Pay Day Loan industry might be unpopular in various venues, it is a thriving industry—revenues of almost $4 billion last year. No legal objection to this point has been upheld to substantially interfere with its operation."

25.     Later in April 2013, the Clearing Firm notified CSCM of its decision to close all of the Tucker and Tribal Companies accounts and directed that all the funds in those accounts be moved off its platform. Per Tucker's instructions, CSCM did not inform any tribal officials when the Clearing Firm ordered that the Tribal Companies' accounts be closed and moved off the Clearing Firm's platform.

26.     CSCM approached multiple financial institutions to assist the Tuckers in finding a new custodian for the funds. As part of that effort, the Partner approached a contact at an investment bank (the "Investment Bank"). In his communications with the Investment Bank, the Partner did not mention the Tuckers and represented that the Clearing Firm "agreed no red flags were raised at [the Clearing Firm] over the past year and ultimately agreed there was [sic] no AML issues … [h]owever, from a social standpoint, [the Clearing Firm] did not wish to be involved with anyone in the payday lending business and the potential negativity that may arise from that business." The CEO commented that the Partner's email had not "mentioned Tucker and the historical items that also swayed [the Clearing Firm's] decision process" and stated that "I feel that is material information and should be disclosed as part of our discussion." The Partner responded that he would do so "if [the Investment Bank] agree to consider the accounts" and added that he had not yet heard from the Investment Bank's representative. The CEO responded "Good job." Ultimately, the Investment Bank determined not to open accounts for the Tribal Companies.

27.     Ultimately, CSCM identified a Kansas-based state-chartered trust company (the "Trust Company") that agreed to custody the Tucker and Tribal Companies accounts and permit CSCM to continue to act as an investment adviser in connection with those assets.  In an email informing the Tuckers of the development, the Partner stated the following:

> [The CEO] and I have found a permanent solution to your
> problem. No longer will we have to worry about hiding your
> business or diversifying your assets to avoid concern and
> uncertainty. We will be eager to meet with you guys when you get
> back to explain our solution and get this process moving. We
> believe it will offer you and the Tribes a great deal of comfort,
> security, and support to your business. We appreciate your
> patience with us during this time and the opportunity to again find
> solutions to the challenges you have presented us with. We hope
> this news will add a little more horsepower to your weekend!

In the same email chain, the CEO stated "[a]s [the Partner] indicated, we are very pleased with our proposed solution to our common issue.  It is one that is simple, safe, user friendly, and long term. By the time you return, we should have all the documentation in order and will be able to move expeditiously."

28.     By the end of May 2013, all of the funds associated with the Tuckers and the Tribal Companies had been transferred from the Clearing Firm to the Trust Company.  CSCM continued to serve as an investment adviser to the Tuckers and the Tribal Companies until the unsealing of the criminal indictment against Tucker on February 10, 2016.

29.     Despite producing documents in connection with the criminal investigation and its awareness of the indictment, CSCM did not file a SAR until December 10, 2018, after Tucker was convicted at trial.